## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SABRINA ANETTE LEARSON,      )
                             )
              Plaintiff,     )
                             )
     v.                      )          1:19CV878
                             )
ANDREW SAUL,                 )
Commissioner of Social       )
Security,                    )
                             )
              Defendant.     )

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Sabrina Anette Learson, brought this action pro se pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act.  (See Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 11 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 14; see also Docket Entry 15 (Defendant's Memorandum)).  For the reasons that follow, the Court should enter judgment for Defendant.

### I. PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of June 12, 2014.  (Tr. 312-13.)  Upon denial of that application initially (Tr. 196-210, 228-31) and on reconsideration (Tr. 211-27, 233-36), Plaintiff filed a request for a hearing de novo before an

Administrative Law Judge ("ALJ") (Tr. 237-39). At the hearing, which Plaintiff, her non-attorney representative, and a vocational expert ("VE") attended, Plaintiff amended her onset date to June 13, 2013. (Tr. 409.) The ALJ subsequently issued a decision finding Plaintiff did not qualify as disabled under the Act from her amended onset date of June 13, 2013, through the date she last remained insured for DIB, June 30, 2015. (Tr. 35-51.)

Plaintiff requested review of the ALJ's decision with the Appeals Council (Tr. 303-06, 450-54) and, on June 1, 2017, the Appeals Council issued a "Notice of Appeals Council Action," informing Plaintiff that it had granted Plaintiff's request for review (Tr. 307-11). In that Notice, the Appeals Council advised Plaintiff that 1) "[t]he hearing decision . . . inaccurately stated that the date [Plaintiff] w[as] last insured for [DIB] was June 30, 2015 (Finding 1)" but that Plaintiff's "certified earnings record show[ed] that [Plaintiff] w[as] actually insured . . . through September 30, 2015" (Tr. 308), 2) "[t]he Appeals Council [wa]s satisfied that the [ALJ] considered the . . . evidence that related to the period after June 2015" (id.), 3) "the Appeals Council propose[d] to update the Listing 12.04 and Listing 12.06 paragraph B criteria findings made in the hearing decision" to comply with regulatory changes that went into effect on January 17, 2017, after the ALJ's decision, see Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66137 (Sept. 26, 2016) (id.), and 4)

2

"[t]he Council further propose[d] to adopt the remaining findings in the hearing decision . . . and find that [Plaintiff] ha[d] not been under a disability at any time from June 13, 2013, . . . through September 30, 2015" (Tr. 309). The Appeals Council's Notice further advised that Plaintiff had 30 days from the date of the Notice to submit "a statement about the facts and the law . . . or additional evidence" meeting the Council's standards for new evidence as stated in the Notice. (Id.) Plaintiff submitted a statement and additional evidence (Tr. 99-195, 436-45), her non-attorney representative sent in a letter brief (Tr. 446-49), "and the Appeals Council considered them" (Tr. 22).[1] On August 4, 2017, the Appeals Council issued a "Notice of Appeals Council Decision Unfavorable" (Tr. 19-21), enclosing a Decision (in accord with its earlier Notice of proposed action) that Plaintiff did not qualify as disabled under the Act from June 13, 2013, to September 30, 2015 (Tr. 22-28), and advising Plaintiff that "[t]he enclosed decision [wa]s the final decision of the Commissioner" (Tr. 19).

On October 4, 2017, Charles E. Binder (an attorney at the same firm as Plaintiff's non-attorney representative) faxed a request to the Appeals Council for a 60-day extension of time for Plaintiff to file an action for judicial review (Tr. 8-13), premised upon the

---

[1] The Appeals Council found a portion of Plaintiff's additional evidence "not relevant to a claim for disability" (Tr. 22), some of that "evidence d[id] not show a reasonable probability that it would change the outcome of the decision" (Tr. 22-23), and the remainder of that "evidence d[id] not relate to the period at issue" in the ALJ's decision (Tr. 23). As a result, the Appeals Council "did not consider and exhibit th[at] evidence." (Tr. 22, 23.)

3

attorney's inability, "despite [his firm's] diligent attempts by telephone and regular mail, . . . to reach [Plaintiff] to discuss the option of appealing [her] claim in federal court" (Tr. 8, 12). On December 6, 2017, the Appeals Council issued a letter extending the time for Plaintiff to file a civil action for 30 days from the date Plaintiff received a copy of the letter (Tr. 5-6) and informing Plaintiff that the Appeals Council would "assume that [Plaintiff] received th[e] letter 5 days after the date on [the letter] unless [she] show[ed] [the Appeals Council] that [she] did not receive it within the 5-day period" (Tr. 5).

Plaintiff, proceeding pro se, filed a complaint in this Court on April 27, 2018, see Learson v. Berryhill, No. 1:18CV348, Docket Entry 2 (M.D.N.C. Apr. 27, 2018); however, Plaintiff failed to answer the question on the form complaint asking her the date on which she "receive[d] notice that the Commissioner's decision was final," which "[wa]s likely the date on which [she] received notice from the . . . Appeals Council that [her] appeal was denied," id. at 3 (italics omitted). The Commissioner filed a "Motion to Dismiss Plaintiff's Complaint" and a Brief in support on grounds of untimeliness, see Learson, Docket Entries 9, 10 (M.D.N.C. July 3, 2018), after which the Clerk of Court sent Plaintiff a notice under Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of her right to respond to the Commissioner's Motion to Dismiss, see Learson, Docket Entry 11 (M.D.N.C. July 5, 2018). Plaintiff did not file a

4

response.  See id., Docket Entries dated July 3, 2018, to Oct. 1, 2018.  On October 1, 2018, the undersigned recommended conversion of the Commissioner's Motion to Dismiss to a motion for summary judgment due to the Commissioner's reliance on documents outside of the pleadings, see Learson v. Berryhill, No. 1:18CV348, 2018 WL 4717973, at *3 (M.D.N.C. Oct. 1, 2018) (unpublished), and further recommended dismissal of the action on grounds of untimeliness "without prejudice to Plaintiff's right to file a new action if she receive[d] a second extension of the statute of limitations from the Commissioner," id. at *5.  Plaintiff did not file objections to the Recommendation, see Learson, Docket Entries dated Oct. 1, 2018, to Oct. 25, 2018, and the Court dismissed the action without prejudice, see id., Docket Entry 14 (M.D.N.C. Oct. 25, 2018) (Biggs, J.).

On May 24, 2019, Plaintiff wrote to the Appeals Council seeking a second extension of time to file a civil action in this Court challenging the Commissioner's denial of DIB.  (Tr. 2-4.) The Appeals Council granted Plaintiff's request and extended the time for her to file a civil action in this Court for 30 days from the date on the letter (August 5, 2019).  (Tr. 1.)  Plaintiff then filed the instant Complaint on August 29, 2019.  (Docket Entry 2.)

In the final decision of the Commissioner in this matter, the Appeals Council made the following findings:

1.   [Plaintiff] met the special earnings requirements of the Act on June 13, 2013, the date [Plaintiff] stated she

became unable to work, and met them through September 30, 2015.

[Plaintiff] has not engaged in substantial gainful activity since June 13, 2013.

2. [Plaintiff] has the following severe impairments: lumbar degenerative disc disease, bilateral degenerative osteoarthritis of the knees, obesity, depression, anxiety, and attention-deficit-hyperactivity disorder [("ADHD")], but does not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

3. [Plaintiff]'s combination of impairments results in the following limitations on her ability to perform work-related activities: sedentary, unskilled work except that [Plaintiff] cannot push or pull on leg controls, walk on slippery or uneven terrain, and climb ropes, ladders, or scaffolds; unable to handle dangerous balancing such as on beams; occasionally climb ramps and stairs with a handrail, stoop, kneel, crouch, and crawl; must avoid exposure to hazards such as unprotected heights and dangerous, unshielded machinery; can perform simple, routine, repetitive tasks in a static environment with infrequent changes; is capable of occasional, superficial interaction with coworkers and supervisors, and rare, meaning less than 5% of the day, and superficial interaction with the public.

4. [Plaintiff]'s alleged symptoms are not consistent with and supported by the evidence of record for the reasons identified in the body of this decision.

5. [Plaintiff] is unable to perform past relevant work as a packager, route sales representative, substitute teacher, special education teacher and truck driver.

. . .

7. If [Plaintiff] had the capacity to perform the full range of the sedentary exertional level, 20 CFR 404.1569 and Rule 201.21, Table No. 1 of 20 CFR Part 404, Subpart P, Appendix 2, would direct a conclusion of not disabled. Although [Plaintiff]'s exertional and nonexertional impairments do not allow her to perform the full range of the sedentary exertional level, using the above-cited

6

Rule as a framework for decisionmaking, there are a significant number of jobs in the national economy, which she could perform, including: addresser, [Dictionary of Occupational Titles ("DOT")] number 209.587-010; eye glass polisher, [DOT] number 713.684-038; and charge account clerk, [DOT] number 205.367-014.

8. [Plaintiff] is not disabled as defined in the . . . Act at any time from June 13, 2013, the [amended] alleged onset date, through September 30, 2015, [Plaintiff]'s date last insured.

(Tr. 24-25.)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan,

7

993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981),

8

and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]   "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition."   Id.   "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled."   Id.

This sequential evaluation process ("SEP") has up to five steps:   "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the [RFC] to (4) perform [the claimant's] past work or (5) any other work."   Albright v.

_____

[2] The Act "comprises two disability benefits programs.  [DIB] provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical."  Craig, 76 F.3d at 589 n.1 (internal citations omitted).

9

Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.'  If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  See id. at 179-80.  However, if the

_____

[3] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the Appeals Council's finding of no disability on these grounds:

1) "[t]he ALJ erred in not properly reviewing [Plaintiff]'s medical records for evidence that meets or equals the listed impairments" (Docket Entry 13 at 6 (bold font and single-spacing omitted));

2) "[t]he ALJ erred by utilizing evidence that proceeded [sic] the onset of [Plaintiff]'s disability" (<u>id.</u> at 7 (bold font and single-spacing omitted));

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

3) "[t]he ALJ assigned inappropriate weight to physician opinions and evidence" (<u>id.</u> at 8 (bold font and single-spacing omitted));

4) "[t]he ALJ erred in his evaluation of medical evidence and his recall of hearing testimony" (<u>id.</u> at 9 (bold font and single-spacing omitted));

5) "[t]he ALJ erred in not fully developing the record for [Plaintiff]'s mental health impairments" (<u>id.</u> at 10 (bold font and single-spacing omitted)); and

6) "[t]he ALJ questioned [Plaintiff]'s credibility in regards to the symptoms of her impairments and disregarded relevant evidence" (<u>id.</u> at 11 (bold font and single-spacing omitted)).[6]

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (<u>See</u> Docket Entry 15 at 15-27.)

## 1. Listings Analysis

In Plaintiff's first assignment of error, she maintains that "[t]he ALJ erred in not properly reviewing [Plaintiff]'s medical records for evidence that meets or equals the listed impairments." (Docket Entry 13 at 6 (bold font and single-spacing omitted).) In particular, Plaintiff contends that the ALJ should have found that

---

[6] Although Plaintiff's issues on review attribute error solely to the <u>ALJ</u> (<u>see</u> Docket Entry 13 at 6-11), the <u>Appeals Council</u> issued the Commissioner's final decision in this matter (<u>see</u> Tr. 22-28). In so doing, the Appeals Council adopted all of the ALJ's findings (except those regarding the date last insured) and updated the ALJ's paragraph B criteria findings regarding listings 12.04 and 12.06. (<u>See</u> Tr. 24.) Accordingly, this Recommendation will refer to the <u>ALJ</u> when discussing Plaintiff's assignments of error unless the discussion involves the paragraph B criteria of Listings 12.04 and 12.06.

her knee impairment met the requirements of Listing 1.02 ("Major dysfunction of a joint"). (Id. (referencing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.02).) Plaintiff further faults the ALJ for "substitut[ing] his own expertise against that of a treating physician" by discounting the opinions of treating psychiatrist Dr. Ajay Veeragandham and treating counselor Tara Russian in determining whether Plaintiff's mental impairments met or equaled the requirements of Listings 12.04 ("Depressive, bipolar, and related disorders") and 12.06 ("Anxiety and obsessive-compulsive disorders"). (Id. at 6-7 (citing Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998), Tr. 819-28, and referencing 20 C.F.R. Subpt. P, App'x 1, §§ 12.04, 12.06).) Those contentions fall short.[7]

"Under Step 3, the [SSA's SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal bracketed numbers omitted). "The

---

[7] Plaintiff challenges the ALJ's omission of Plaintiff's "herniated nucleus pulposus, spinal stenosis, and degenerative joint disease of the knees with complete collapse" from the ALJ's step two severity determination and step three listings analysis. (Docket Entry 13 at 6.) That argument fails because the ALJ acknowledged that Plaintiff had significant spine and knee impairments by finding that she suffered from severe "lumbar degenerative disc disease" and "bilateral degenerative osteoarthritis of the knees." (Tr. 41.) Moreover, in the portion of the decision in which the ALJ discussed the RFC, he expressly discussed that "imaging revealed degenerative disc disease in [Plaintiff's] lumbar spine with disc protrusion, and osteoarthritis in both of her knees." (Tr. 45 (citing, inter alia, Tr. 667, 671-72, 692-93).)

13

listings set out at 20 CFR [P]t. 404, [S]ubpt. P, App['x] 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett, 917 F.2d at 160 (citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); see also Zebley, 493 U.S. at 530 ("An impairment that manifests only some of those criteria [in a listing], no matter how severely, does not qualify.").

**a. Listing 1.02A[8]**

To meet the requirements of Listing 1.02A, a claimant must show "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion . . ., and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis" involving "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), [and] resulting in inability to ambulate

---

[8] Plaintiff does not argue that she suffers from a gross anatomical deformity that results in an "inability to perform fine and gross movements effectively" as required by Listing 1.02B. (See Docket Entry 13 at 6-7.)

14

effectively, as defined in [Section] 1.00B2b," 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A. The cross-referenced regulatory section, in turn, states that "[i]nability to ambulate effectively means an _extreme_ limitation of the ability to walk . . . defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of _both_ upper extremities," _id.,_ § 1.00B2b(1) (emphasis added) (internal parenthetical citation omitted). According to Plaintiff, "[t]he record presents evidence that she meets [Listing 1.02A's] requirements of gross anatomical deformity, chronic joint pain, stiffness with signs of limitation of motion, [and] medically acceptable imaging of joint narrowing and bony destruction," as well as that Plaintiff "display[ed] her difficulty in ambulating by the use of her cane for standing and walking." (Docket Entry 13 at 6.)

   With regard to Listing 1.02A, the ALJ stated as follows:

   Particular attention was given to [Listing 1.02A]. However, the specified criteria required of the [L]isting was not demonstrated by the available medical evidence. Specifically, the [L]isting requires gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and finding on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint. The [L]isting also requires involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively as defined in [Section] 1.00(B)(2)(b). In this case, the evidence does not

15

> demonstrate that [Plaintiff] has the degree of difficulty in ambulating as defined in [Section] 1.00(B)(2)(b).

(Tr. 41-42 (emphasis added).)  Thus, as the above-quoted discussion makes clear, the ALJ focused on the "inability to ambulate effectively" requirement of Listing 1.02A, and found that the record evidence did not show that Plaintiff's knee impairment caused the requisite degree of difficulty in ambulation.

Plaintiff's reliance on her alleged cane usage to satisfy the "inability to ambulate effectively" requirement fails for two reasons.  (Docket Entry 13 at 6.)  First, the ALJ did not find that the medical evidence supported Plaintiff's need for a cane:

> [D]espite testifying that she needed a cane, [Plaintiff] did not produce a prescription for a cane and the need for a cane contradicts her physical therapy notes. Moreover, [c]onsultative [e]xaminer Dr. Alan Cohen found that [Plaintiff] did not need a cane.  Consistent with Dr. Cohen's finding, [Plaintiff] demonstrated normal gait and station on multiple occasions.  Straight leg raising was negative and she had full muscle strength.  Moreover, at one time, her range of motion was normal.  [Plaintiff] also reported relief from aches and pains with the use of one of her medications.  Notably, despite complaints of chronic knee pain, . . . on at least one occasion, [Plaintiff] complained only of low back pain.  She also testified that the treatment for her knees provided relief.  During her [c]onsultative [e]xamination, the examiner found that [Plaintiff] had normal range of motion in her knees.  Further, at one time, [Plaintiff] reported that her low back pain did not extend into either lower extremity.

(Tr. 45-46 (internal citations omitted).)  Plaintiff did not challenge the above-quoted analysis by the ALJ of Plaintiff's need for a cane (see Docket Entry 13), and the record supports the ALJ's assertions in that regard.

16

Second, the regulations provide examples of ineffective ambulation, which include "the inability to walk without the use of a walker, two crutches or <u>two canes</u>," "the inability to walk a block at a reasonable pace on rough or uneven surfaces," and "the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(B)(2)(b) (emphasis added). Thus, even if Plaintiff's knee (or other) impairment necessitated the use of one cane, that would not "limit[] the functioning of <u>both</u> upper extremities," <u>id.</u>, § 1.00B2b(1) (emphasis added), as required for an inability to ambulate effectively. <u>See</u> <u>McAuley v. Colvin</u>, No. 7:12CV311, 2013 WL 7098724, at *9 (E.D.N.C. Dec. 13, 2013) (unpublished) (holding that "an inability to ambulate effectively means an inability to ambulate without the use of a device that requires *both* upper extremities" and thus that the claimant's "use of a cane d[id] not bring [the claimant] within the ambit of [a listing requiring an inability to ambulate effectively]" (emphasis in the original)).

## b. Listings 12.04 and 12.06

With regard to Listings 12.04 and 12.06, Plaintiff faults the ALJ for "substitut[ing] his own expertise against that of a treating physician" by discounting the opinions of treating psychiatrist Dr. Ajay Veeragandham and treating counselor Tara Russian in determining whether Plaintiff's mental impairments met or equaled the requirements of Listings 12.04 and 12.06. (Docket

17

Entry 13 at 6-7 (citing <u>Balsamo</u>, 142 F.3d at 81, Tr. 819-28, and referencing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06).)  Those contentions fail to warrant relief.

Effective on January 17, 2017, the Commissioner made substantial revisions to the criteria for evaluating mental disorders in the Listing of Impairments.  <u>See</u> https://www.federalregister.gov/documents/2016/09/26/2016-22908/revised-medical-criteria-for-evaluating-mental-disorders (last visited July 21, 2020).  As relevant to this case,[9] to meet the paragraph B criteria of revised Listings 12.04 and 12.06, a claimant must show "<u>[e]xtreme</u> limitation of <u>one</u>, or <u>marked</u> limitation of <u>two</u>, of the following areas of mental functioning:

1. Understand, remember, or apply information[;]

2. Interact with others[;]

3. Concentrate, persist, or maintain pace[; and]

4. Adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04B, 12.06B (internal citations omitted) (emphasis added).

As mentioned above, the Appeals Council made its own paragraph B criteria findings in order to conform those findings to the 2017 regulatory revisions.  In that regard, the Appeals Council found

---

[9] The ALJ and Appeals Council both apparently assumed, without explicitly finding, that Plaintiff's mental impairments satisfied the paragraph A criteria of Listings 12.04 and 12.06 (<u>see</u> Tr. 24, 42), and Plaintiff did not raise any arguments directed at the ALJ's findings with respect to the paragraph C criteria (<u>see</u> Docket Entry 13).

that Plaintiff "had[] mild limitations in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing herself." (Tr. 24.) In support of those findings, the Appeals Council noted that Plaintiff "drives, prepares meals, and takes care of her daughter; is cooperative with her medical providers and gets along with people in all professions; has good judgment and insight; has good attention and intact memory but is easily distractible and has trouble falling asleep; and is studying for a college degree." (Id.)

Plaintiff's argument misses the mark, because Dr. Veeragandham and Counselor Russian did not offer opinions regarding whether Plaintiff's mental conditions met or equaled the requirements of Listings 12.04 and 12.06. (See Tr. 819-28.) Consistent with that fact, neither the ALJ nor the Appeals Council had cause to address (and therefore did not discount) Dr. Veeragandham and/or Counselor Russian in analyzing whether Plaintiff's mental impairments met or equaled those Listings. (See Tr. 24, 42.)

In short, Plaintiff has not established reversible error with respect to the ALJ's and Appeal Council's listings determinations.

## 2. Consideration of Pre-Onset Evidence

Next, Plaintiff asserts that "[t]he ALJ erred by utilizing evidence that proceeded [sic] the onset of [Plaintiff]'s

19

disability." (Docket Entry 13 at 7 (bold font and single-spacing omitted).) In particular, Plaintiff maintains that she suffered an on-the-job injury in October 2012 and "sought treatment under Work[ers] Compensation with Dr. Zane Walsh," including "successful treatment with physical therapy," which Plaintiff "chose to end . . . in February of 2013." (Id.) Plaintiff notes that she "did not return to Dr. Walsh until . . . an assessment of her limitations for the Cumberland County Department of Social Services [('DSS')] Work-First Program in January 2015," but that her then-attorneys "submitted [all] of the medical records from Dr. Walsh, rather than only submitting the [DSS] notes." (Id.) As a result, Plaintiff faults the ALJ for "overlook[ing] the dates [of the treatment notes] and rel[ying] heavily on the notes [from Dr. Walsh preceding Plaintiff's disability onset date] in [the ALJ's] decision at least a half dozen times." (Id.)

Plaintiff's contentions fail for two reasons. First, the regulations direct the Commissioner to develop a claimant's medical history "for <u>at least</u> the 12 months preceding the month in which [the claimant files an] application." 20 C.F.R. § 404.1512(a), (d) (emphasis added), and thus the regulations clearly anticipate the ALJ's consideration of some pre-onset evidence. Second, Plaintiff informed her treatment providers that her on-the-job injury in October 2012, as well as a motor vehicle accident in May 2013 (also preceding the onset date), triggered her disabling back pain.

20

(See, e.g., Tr. 562, 645, 656.)  Accordingly, the extent to which Plaintiff responded to treatment and physical therapy following her on-the-job injury holds relevance to the determination of her functional limitations arising from her back impairment during the period of adjudication.

In sum, Plaintiff's second issue on review fails as a matter of law.

### 3. Evaluation of Opinion Evidence

In Plaintiff's third assignment of error, she contends that "[t]he ALJ assigned inappropriate weight to physician opinions and evidence." (Docket Entry 13 at 8 (bold font and single-spacing omitted).)  In that regard, Plaintiff objects to the ALJ's assessment of the opinions of 1) the state agency psychological consultants, 2) the state agency medical consultants, 3) Dr. Veeraghandam, 4) Counselor Russian, and 5) Dr. Walsh. (Id. at 8-9.)  However, as discussed below, the ALJ did not err with respect to his analysis and weighing of any of those opinions.

### a.  State Agency Psychological Consultants

Plaintiff contends that "[g]reat weight was given to the State Agency Psychological Consultant SXR," but that "th[e SXR] assessment never occurred" and "the only contact she ha[d] with a state agency was a basic physical examination that did not include a mental health assessment." (Id. at 8 (referencing Tr. 47).)  However, Plaintiff confuses Dr. Cohen's consultative _medical_

21

examination (see Tr. 654-58), which he performed on behalf of "SXR Medical LLC" (Tr. 656), and the mental severity and RFC analyses provided by the <u>non-examining</u> state agency psychological consultants, who offered opinions based on their review of the record (see Tr. 201-02, 205-07, 218-19, 222-24). The ALJ here did accord "great weight" to the state agency psychological consultants' opinions, specifically crediting their opinion that Plaintiff remained capable of simple, routine, and repetitive tasks ("SRRTs") (Tr. 47), and incorporated a limitation to SRRTs, as well as restrictions on workplace changes and social interaction, into the RFC (see Tr. 44).

Although, as a general matter, opinions from an examining source warrant more weight than those from a non-examining source, <u>see</u> 20 C.F.R. 404.1527(c)(1), non-examining state agency consultants constitute "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation[,]" 20 C.F.R. § 404.1527(e)(2)(I). Thus, the ALJ could permissibly credit the opinions of the non-examining state agency psychological consultants, who rendered their opinions without the benefit of a full record, over those of even a treating psychiatrist, to the extent the consultants' opinions remain consistent with the evidence received subsequent to their opinions. See <u>Lapeer v. Astrue</u>, No. 5:08CV256, 2009 WL 2487038, at *7 (E.D.N.C. Aug. 13, 2009) (unpublished). Plaintiff's

22

psychiatric treatment with Dr. Veeragandham, including the findings on mental status examinations, remained consistent both before and after the state agency psychological consultants offered their opinions in October and November of 2014. (Compare Tr. 503-26, 660-63, 788-89, with Tr. 772-87, 834-53.) Plaintiff has thus not provided the Court with a basis to disturb the ALJ's analysis of the state agency psychological consultants' opinions.

b. **State Agency Medical Consultants**

Plaintiff additionally challenges the ALJ's assignment of "[g]reat weight . . . to the findings [of the state agency medical consultants] that [Plaintiff] could sit for 6 hours and occasionally stoop, crouch, and crawl given that [Plaintiff] reported relief with medication, had some generally normal range of motion findings, even in her knees[,] and had a normal gait." (Docket Entry 13 at 8 (referencing Tr. 47, 204, 220-21).) According to Plaintiff, "[t]h[o]se findings were derived from a very basic examination [by Dr. Cohen] that was not thorough enough to determine [Plaintiff]'s limitations," and the ALJ "also referred to [Plaintiff's] self-report that various positions helped relieve some pain, a physician's note that d[id] not indicate any of [Plaintiff]'s abilities and physician notes that preceded her disability." (Id.)

As an initial matter, Plaintiff makes no effort to explain why Dr. Cohen's examination "was not thorough enough to determine

[Plaintiff]'s limitations" (<u>id.</u>). (<u>See id.</u>) Moreover, contrary to Plaintiff's conclusory claim, Dr. Cohen's assessment contained all of the standard components of a consultative physical evaluation, including the chief complaint/history of present illness (<u>see</u> Tr. 656), current medications (<u>see id.</u>), social history (<u>see id.</u>), family history (<u>see id.</u>), review of systems (<u>see id.</u> at 656-57), and a physical examination of all of Plaintiff's major body systems (<u>see</u> Tr. 657-58), including range of motion testing (<u>see</u> Tr. 654). Dr. Cohen additionally took x-rays of Plaintiff's lumbar spine. (<u>See</u> Tr. 655.) More significantly, the ALJ relied on multiple sources as support for his assignment of great weight to the state agency medical consultants' opinions regarding Plaintiff's ability to sit, stoop, crouch, and crawl (<u>see</u> Tr. 47 (citing "Hearing Testimony," and Tr. 455, 654-58, 830-33)), including Plaintiff's own hearing testimony that some of her medications helped to relieve her pain (<u>see</u> Tr. 70-71), as well as normal findings on examination by Dr. Walsh on February 28, 2013 (<u>see</u> Tr. 455), Dr. Cohen on October 1, 2014 (<u>see</u> Tr. 656-57), and Dr. Charles S. Haworth, a neurosurgeon who evaluated Plaintiff on February 27, 2015 (<u>see</u> Tr. 830-33).

In sum, the ALJ supplied substantial evidence to support the assignment of "great weight" to the state agency medical consultants' opinions (Tr. 47).

c.    **Dr. Veeragandham/Counselor Russian**

Plaintiff next argues that, although "[t]he ALJ admitted to the severity of [Plaintiff]'s mental health, [he] only gave little weight to the opinions of her treating psychiatrist Dr. Veeraghandam and her mental health therapist [Counselor] Russian." (Docket Entry 13 at 8.)  According to Plaintiff, "[t]he opinion, diagnosis, and medical evidence tendered by a treating physician should be accorded considerable weight."  (Id. (citing Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984)).)

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment.  See 20 C.F.R. § 404.1527(c) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").  The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference.  The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion.  See 20 C.F.R. § 404.1527(c)(2)(ii).  Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions,

25

deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. See 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590 (emphasis added).

The ALJ analyzed the opinions from Dr. Veeragandham and Counselor Russian as follows:

> The [ALJ] gave little weight to the opinions of [Counselor] Russian, [Plaintiff]'s therapist, and Dr. [] Veeraga[ndham], [Plaintiff]'s treating psychiatrist. The [ALJ] observes that [Plaintiff]'s regular therapy for at least two years was consistent with [Plaintiff]'s diagnoses and a finding of severe mental health impairments. However, the [ALJ] observes that particularly [Counselor] Russian, but also Dr. Veeraga[ndham], noted that [Plaintiff] reported an inability to work, rather than stating that they were specifically finding that [Plaintiff] was unable to work. There was no evidence that [Plaintiff] was completely unable to work due to her mental health. For instance, there were many normal findings as discussed above, and [Plaintiff] herself indicated her mental health concerns were largely situational. Similarly, there was no support for marked limitations in the areas of concentration, socialization, or adapt[at]ion. First, as noted, many observations were based on [Plaintiff]'s self-reports. Second, marked limitations were inconsistent with [Plaintiff]'s improvement with medication, the fact that she ceased therapy, and her statement that she felt "okay" most of the time. Further, [Plaintiff] reported that she could socialize with her peers and that she got along with people in many professions. There was also no support for a finding that [Plaintiff] would have missed multiple days per month due to her mental health, especially given that as of February 2016, [Plaintiff] had improved such that she enrolled in classes and moved into her own apartment.

26

The [ALJ] also observes that [Plaintiff] continued to
care for her minor child.

(Tr. 46-47 (emphasis added) (internal citations omitted).) The ALJ
provided multiple reasons to discount the opinions of Dr.
Veeragandham and Counselor Russian in accordance with the
regulations, including a lack of support from Dr. Veeragandham's
own records and inconsistency with the record as a whole. See 20
C.F.R. § 404.1527(c)(2)-(4); Craig, 76 F.3d at 590. Plaintiff has
thus not shown that the ALJ erred by failing to accord controlling
weight to those opinions.

Plaintiff also specifically challenges the ALJ's observation,
emphasized above, that Dr. Veeragandham and Counselor Russian based
their opinions in large part on Plaintiff's subjective reports that
she remained unable to work rather than objective findings.
(Docket Entry 13 at 8-9.) In that regard, Plaintiff argues that
"[t]he ALJ based his decision on a note from [Counselor] Russian
that stated, 'Reports limited ability to work due to medical
conditions, i.e. knees, back problems,'" but that "[t]he note
clearly states that [Plaintiff] reports an[] inability to work due
to physical impairments, and is not a report of [Plaintiff]'s
mental health status." (Id. (referencing Tr. 818).)

The "note" in question appears in a Mental Impairment
Questionnaire completed by Counselor Russian on June 15, 2015.
(See Tr. 824-28.) In response to the question, "Does [Plaintiff]
experience episodes of decompensation or deterioration in a work or

27

work-like setting which causes [her] to withdraw from the situation and/or experience an exacerbation of symptoms?" Counselor Russian marked the box for "Yes" and stated: "[Plaintiff] has a [history] of isolation in work settings, per [Plaintiff's] report. [Plaintiff] currently reports limited ability to work due to medical conditions, ie - knees, back problems." (Tr. 826 (emphasis added).)

Plaintiff's criticism of the ALJ's observation of Counselor Russian's reliance on Plaintiff's subjective symptom reports fails for two reasons. First, contrary to Plaintiff's argument, Counselor Russian's statement in question does constitute "a report of [Plaintiff]'s mental health status" (Docket Entry 13 at 9), because Counselor Russian only treated Plaintiff for mental impairments and only offered opinions regarding Plaintiff's mental functional limitations. (See Tr. 818, 824-29.) Second, in a "To Whom It May Concern" letter from Counselor Russian, she explained the connection between Plaintiff's physical impairments and mental impairments:

> [Plaintiff] has been attending psychotherapy since 1/8/15, approx. every other week. She was referred to therapy by her psychiatrist she has been seeing here, since 6/5/13, due to Major Depressive Disorder, Generalized Anxiety Disorder and ADHD. The focus of sessions is on decreasing depressive symptoms, irritability and anxiety, using cognitive behavioral therapy. [Plaintiff] has reported having a very difficult time lately due to worsening medical conditions which have exacerbated her psychiatric issues. [Plaintiff] reports inability to perform most work

28

<u>related tasks due to her medical problems</u>. [Plaintiff] will benefit from ongoing psychotherapy.

(Tr. 818 (emphasis added).)[8]  In other words, Counselor Russian relied not only on Plaintiff's report of "worsening medical conditions," but also on Plaintiff's report that those conditions "exacerbated her psychiatric issues."  (<u>Id.</u>)[9]

**d.  Dr. Walsh**

Plaintiff also finds fault with the ALJ's decision to afford "some weight" to a functional evaluation that Dr. Walsh conducted for the DSS in April 2015.  (Docket Entry 13 at 9 (referencing Tr. 711-12).)  In that regard, Plaintiff asserts that the ALJ "ignored medical evidence" from that evaluation and, although he "found the result of the [evaluation] unacceptable, . . . he relied heavily on the physical therapy notes from Dr. Walsh's office that preceded the onset of [Plaintiff]'s disability."  (<u>Id.</u>)

On April 6, 2015, Dr. Walsh completed a "Report of Medical Examination" for the DSS (<u>see</u> Tr. 711-12), on which he diagnosed Plaintiff with degenerative disc disease of the lumbar spine since May 2013 and deemed Plaintiff's prognosis "[f]air" (Tr. 711).  Dr. Walsh opined that Plaintiff's lumbar impairment limited her to five hours of sitting, three hours of standing, and one hour of walking,

---

[8] Diane Lee, a psychologist, co-signed the note.  (<u>See</u> Tr. 818.)

[9] Dr. Veeragandham also relied on Plaintiff's subjective reports on the Mental Impairment Questionnaire by stating that Plaintiff's "diagnosis was based upon the [Diagnostic and Statistical Manual of Mental Disorders ('DSM')] and <u>past history that was reported</u>."  (Tr. 821 (emphasis added).)

29

bending, lifting, and carrying per day, as well as that Plaintiff should not lift more than 10 to 15 pounds occasionally. (Tr. 712.) Dr. Walsh believed Plaintiff qualified as "a candidate for referral to Vocational Rehabilitation." (Id.)

The ALJ evaluated and weighed Dr. Walsh's report as follows:

> The [ALJ] gave some weight to the findings in [Dr. Walsh's report]. Many of the findings demonstrated that [Plaintiff] was limited physically consistent with the [RFC]. For instance, [Dr. Walsh] found that [Plaintiff] could not lift more than 15 pounds and could not stand for more than three hours. These findings were generally consistent with [Plaintiff]'s obesity, degenerative disc disease, and osteoarthritis in her knees. However, it was clear that the [report] was not consistent with the regulations and analysis used by the [SSA]. For example, [Dr. Walsh] found that [Plaintiff] could only lift for one[ ]hour total. This was not consistent with [Plaintiff]'s consistent ability to care for her child, or her improvement with physical therapy.

(Tr. 48 (internal citations omitted).)

In this analysis, the ALJ credited Dr. Walsh's opinions that Plaintiff could not lift more than 15 pounds or stand more than three hours as consistent with the medical evidence (id.), and incorporated even greater restrictions on lifting and standing into the RFC (see Tr. 44). However, the ALJ discounted Dr. Walsh's opinion that Plaintiff could lift for only one hour because 1) the SSA does not quantify how much of a workday claimants can engage in lifting by the "hour" but rather using the terms "occasionally," "frequently," and "constantly," 20 C.F.R. § 404.1567 (providing that SSA uses definitions from the DOT in describing exertional requirements); see also DOT, App'x C ("Components of the Definition

30

Trailer"), § IV ("Physical Demands – Strength Rating (Strength)"), 1991 WL 688702 (G.P.O. 4th ed. rev. 1991) (providing definitions of "occasionally," "frequently," and "constantly"), and 2) that opinion lacked consistency with Plaintiff's ability to care for her young child and improvement in symptoms after physical therapy with Dr. Walsh (and his staff). (Tr. 48.) Thus, in addition to noting the different standards relied upon, the ALJ permissibly discounted Dr. Walsh's lifting opinion as inconsistent with the record as a whole and as not supported by Dr. Walsh's own treatment records, see 20 C.F.R. § 404.1527(c)(2)-(4); Craig, 76 F.3d at 590.

In light of these considerations, Plaintiff has not demonstrated reversible error arising out of the ALJ's handling of opinion evidence.

### 4. Formulation of RFC[10]

Plaintiff additionally maintains that "[t]he ALJ erred in his evaluation of medical evidence." (Docket Entry 13 at 9 (bold font and single-spacing omitted).) In particular, Plaintiff asserts that "[t]he ALJ did not fully develop the record for his [RFC] assessment," because "[t]he record presents an abundance of evidence that attest[s] to [Plaintiff]'s inability to perform any of the tasks [in the RFC] due to pain." (Id.) Plaintiff further

_____

[10] Plaintiff breaks down her fourth assignment of error into two subparts – subpart A dealing with the RFC and subpart B dealing with VE testimony. (See Docket Entry 13 at 9-10.) Because those subparts deal with procedurally distinct issues, this Recommendation discusses them as separate assignments of error.

31

faults the ALJ for "overlook[ing Plaintiff]'s use of a cane and her use of narcotic pain medicine." (Id. at 9-10.)

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c). An ALJ need not discuss every piece of evidence in making an RFC determination. See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (citing Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)). However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).

The ALJ here sufficiently explained how he formulated the RFC determination. (See Tr. 44-49.)[11] The ALJ first reviewed the medical evidence of record (see Tr. 45-46), making the following, pertinent findings:

- "despite [Plaintiff's] obesity and positive findings [on examination], physical therapy treatment notes indicated that [Plaintiff]'s balance was intact both sitting and standing, that she had no limp, [] that she had no complaints when performing transfers[, and that her] recovery was excellent" (Tr. 45; see also Tr. 455);

- Dr. Haworth "found [Plaintiff]'s condition did not need surgical attention" (Tr. 45; see also Tr. 833);

- "despite testifying that she needed a cane, [Plaintiff] did not produce a prescription for a cane and the need for a cane contradicts her physical therapy notes" (Tr. 45; see also Tr. 72, 78-79, 455-89);

- Dr. Cohen "found that [Plaintiff] did not need a cane" (Tr. 45; see also Tr. 658) and "found that [Plaintiff] had normal range of motion in her knees" (Tr. 46; see also Tr. 654);

- Plaintiff "demonstrated normal gait and station on multiple occasions," "[s]traight leg raising was negative[,] and she had full muscle strength" (Tr. 46 (citing Tr. 645-59, 715-16)); and

- Plaintiff "reported relief from aches and pains with the use of one of her medications" and "also testified that the treatment for her knees provided relief" (id.; see also Tr. 70-71).

_____

[11] Plaintiff's challenge to the RFC focuses on the impact of her pain on her functional abilities. (See Docket Entry 13 at 9-10.) Accordingly, the undersigned limits the discussion of the RFC to Plaintiff's physical (as opposed to mental) impairments.

33

That analysis supplies substantial evidence to support the RFC. Moreover, in addition to the findings quoted above regarding Plaintiff's alleged need for a cane, the ALJ acknowledged that Plaintiff's "medication included at least one opioid." (Tr. 45.) Thus, the ALJ clearly did not "overlook[ Plaintiff]'s use of a cane and her use of narcotic pain medicine" (Docket Entry 13 at 9-10).

In determining the RFC, the ALJ also evaluated Plaintiff's subjective complaints of back and knee pain; however, the ALJ ultimately found that Plaintiff's "allegations concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence" (Tr. 45), and, as discussed below in connection with Plaintiff's last assignment of error, the ALJ did not err in his analysis of Plaintiff's subjective complaints. Moreover, the ALJ also considered and weighed the opinion evidence of record (see Tr. 46-48) and, as detailed supra, Plaintiff has not shown error with respect to the ALJ's review of the opinions of record.

Simply put, Plaintiff's contentions regarding the RFC do not entitle her to reversal or remand.

### 5. Consideration of VE Testimony

Plaintiff next argues that "[t]he ALJ erred in his . . . recall of hearing testimony" (Docket Entry 13 at 9 (bold font and single-spacing omitted)), in that he "omitted pertinent testimony from the [VE] in his decision" (id. at 10 (bold font and single-

34

spacing omitted)).  More specifically, Plaintiff objects to the ALJ's failure to acknowledge the VE's testimony in response to three hypothetical questions reflecting "similar profiles to [Plaintiff]" that Plaintiff "was unable to do past work and was unable to do any other work in the national economy." (Id. (citing Tr. 84-88).)

At step five of the SEP, the ALJ may rely on the testimony of a VE to determine whether a claimant can perform work that exists in significant numbers in the national economy given the claimant's work-related limitations.  See 20 C.F.R. §§ 404.1520(g), 404.1566(e).  The VE's opinions "must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

In this case, the ALJ first asked the VE a hypothetical question containing restrictions that matched the RFC. (See Tr. 84-85, see also Tr. 44.)  In response, the VE testified that, although an individual with those restrictions could not perform any of Plaintiff's past work, three jobs existed conforming to the hypothetical and available in significant numbers in the national economy. (See Tr. 85.)  The ALJ then inquired whether adding a need for a cane would have any impact on the three cited jobs, and the VE responded in the negative. (Id.)  At that point, the ALJ asked three more hypothetical questions containing restrictions that the ALJ did not ultimately incorporate into the RFC – 1)

35

"[f]or at least two-thirds of the work day the individual cannot maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with others without being distracted by them, complete a work day without interruptions from psychological symptoms, accept instructions and respond appropriately to criticism from supervisors and respond appropriately to work place changes" (Tr. 86-87) ("Hypo 3"), 2) "th[e] hypothetical individual . . . would be off-task 15 percent of the work day or work week" (Tr. 87) ("Hypo 4"), and 3) "th[e] hypothetical individual . . . would miss work twice a month, be late twice a month or have to leave early twice a month, or any combination of those three twice a month" (id.) ("Hypo 5"). The VE responded that, for each of those hypothetical individuals, no work existed. (See Tr. 87, 88.)

Contrary to Plaintiff's assertions, the ALJ did not err by failing to adopt the VE's testimony in response to Hypos 3, 4, and 5, because "[b]y presenting a hypothetical, the ALJ was not making findings of fact" and thus the ALJ could present multiple (and even contradictory) hypotheticals to the VE and then later determine which hypothetical "most closely fit the evidence of record." Davis v. Apfel, No. 97-1719, 1998 WL 559728, at *2 (4th Cir. Sept. 2, 1998) (unpublished). The ALJ modeled Hypo 3 after Dr. Veeragandham's marked limitations on the Mental Impairment

Case 1:19-cv-00878-LCB-LPA   Document 16   Filed 08/27/20   Page 36 of 47

Questionnaire (compare Tr. 86-87, with Tr. 822),[12] but the ALJ ultimately gave "little weight" to Dr. Veeragandham's opinions (Tr. 46) and, as discussed above, did not err in doing so. Regarding Hypo 4, the ALJ and Appeals Council both found that Plaintiff's mental impairments caused only a moderate limitation in Plaintiff's ability to maintain concentration, persistence, or pace and neither found that she would remain off-task for 15 percent of the workday. (See Tr. 43.) With respect to Hypo 5, the ALJ expressly discounted the opinions of Dr. Veeragandham and Counselor Russian that Plaintiff's mental impairments would cause her to miss multiple days of work per month (see Tr. 823, 828), noting that, "as of February 2016, [Plaintiff] had improved such that she enrolled in classes and moved into her own apartment" and "continued to care for her minor child" (Tr. 47).

Under those circumstances, Plaintiff has not shown that the ALJ erred by disregarding the VE's testimony in response to Hypos 3, 4, and 5. See Davis, 1998 WL 559728, at *2.

---

[12] The ALJ mistakenly referred to Dr. Veeragandham's Mental Impairment Questionnaire as Exhibit "17F" (Tr. 87) when in fact the Questionnaire appears at Exhibit 24F (see Tr. 819-23). Further, the ALJ included a limitation in Hypo 3 that, for two-thirds of the work day, the individual could not "accept instructions and respond appropriately to criticism from supervisors" (Tr. 87), whereas Dr. Veeragandham instead found marked limitation (meaning more than two-thirds of the work day) in Plaintiff's ability to "[g]et along with coworkers or peers without distracting them" (Tr. 822). The two functional social abilities appear next to one another on the Questionnaire (see id.) and thus the ALJ likely mis-attributed Dr. Veeragandham's marked limitation in getting along with others to the ability to deal with instructions/criticism.

### 6. Discussion of Mental Health Evidence

Plaintiff additionally posits that "[t]he ALJ erred in not fully developing the record for [Plaintiff]'s mental health impairments." (Docket Entry 13 at 10 (bold font and single-spacing omitted).) In that regard, Plaintiff asserts that the "ALJ's view of [Plaintiff]'s concentration, socialization, and adaptation are contradictory to [Plaintiff]'s homelessness in which [sic] she suffered from again, just months after the hearing," and that she "showed marked difficulties in that her professors asked her to take a break from school due to her mental status." (Id. at 11.) Plaintiff further notes that, "[a]lthough [she] stated in the hearing testimony that she was no longer in school, []the ALJ [] repeatedly stated in the hearing decision that [Plaintiff] showed improvement by attending classes." (Id.) Plaintiff also points to "several other incidences where [the] ALJ [] took [Plaintiff]'s statements out of context, inferred his opinion of the evidence in the record and ignored hearing testimony." (Id. (citing Tr. 511, 517, 660, 662, 819-23, 824-28, 846).) Plaintiff's arguments falter for three reasons.

First, the record does not establish that Plaintiff suffered from "homelessness" during the relevant period. (See Tr. 76 (reflecting Plaintiff's testimony that she moved into a new apartment with her daughter in October 2015), 374 (recording that, after eviction in June 2014, Plaintiff began residing in an

38

apartment with her sister), 660 (indicating that Plaintiff moved with her brother out of her sister's house in October 2014), 662 (documenting that Plaintiff resided with her sister in September 2014), 836 (showing that, due to power cut-off at her apartment, Plaintiff moved into a friend's home in January 2016), 840 (referencing Plaintiff's residence in a subsidized apartment in November 2015), 842 (containing Plaintiff's report that she lived with a friend's mother in October 2015), 844 (reporting Plaintiff's search for an apartment in September 2015). That evidence shows, at most, that Plaintiff experienced housing instability during the relevant period, rather than "homelessness."

Moreover, Plaintiff has not shown that her housing instability caused her to suffer marked limitations in concentration, socialization, and adaptation. To the contrary, as the Appeals Council noted, Plaintiff "drives, prepares meals, and takes care of her daughter; is cooperative with her medical providers and gets along with people in all professions; has good judgment and insight; has good attention and intact memory but is easily distractible and has trouble falling asleep; and is studying for a college degree" (Tr. 24).

Second, the fact that Plaintiff's "professors asked her to take a break from school due to her mental status" (Docket Entry 13 at 11) does not mandate a finding of marked restrictions in concentration, socialization, and adaptation. Plaintiff's asserted

39

inability to focus and/or concentrate on her coursework (see, e.g.,
Tr. 75, 80-81, 521) may show that Plaintiff had some limitations in
concentration and adaptation; however, as discussed above, the
Appeals Council relied upon other substantial evidence of record to
find only moderate limitations in those areas of mental
functioning, as well as socialization. (See Tr 24.) Moreover,
notwithstanding Plaintiff's inability to fully complete her
studies, the ALJ did not err by "stat[ing] in the hearing decision
that [Plaintiff] showed improvement by attending classes" (Docket
Entry 13 at 11), because even the desire to enroll in collegiate
classes, the ability to apply for and gain acceptance to such
classes, and the successful completion of at least one year of
collegiate coursework (see Tr. 505) supplies evidence that
Plaintiff's mental impairments did not cause marked limitations in
concentration, socialization, and adaptation.

Third, although Plaintiff refers generally to "several other
incidences where [the] ALJ [] took [Plaintiff]'s statements out of
context, inferred his opinion of the evidence in the record and
ignored hearing testimony," she provides no explanation of which of
her statements the ALJ "took out of context," which evidence the
ALJ made inferences about, and which hearing testimony the ALJ
ignored. (Docket Entry 13 at 11 (citing Tr. 511, 517, 660, 662,
819-23, 824-28, 846).) Even given the liberal construction due pro
se pleadings, see Haines v. Kerner, 404 U.S. 519, 520 (1972),

40

Plaintiff's conclusory assertion fails to point the Court to a specific error by the ALJ.

For these reasons, Plaintiff's challenge to the ALJ's evaluation of the mental health evidence fails.

## 7. Analysis of Plaintiff's Subjective Symptom Reporting

Lastly, Plaintiff contends that "[t]he ALJ questioned [Plaintiff]'s credibility in regards to the symptoms of her impairments and disregarded relevant evidence." (Docket Entry 13 at 11 (bold font and single-spacing omitted).) According to Plaintiff, she "submitted evidence that shows she was reprimanded for and ultimately fired for taking time out of work to go to appointments" (id.), but that "the ALJ stated that there was no support for a finding that multiple days per month would be missed from work" (id. at 12 (referencing Tr. 47)). Additionally, Plaintiff points out that the ALJ "overlooked" Plaintiff's "hearing testimony that knee injections did not completely relieve her pain[, ] that pain medications were only somewhat effective on her pain level[, and] that she was in need of knee replacements." (Id.)

Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *5 (Oct. 25, 2017) ("SSR 16-3p") (consistent with the Commissioner's regulations) adopts a two-part test for evaluating a claimant's statements about symptoms. See SSR 16-3p, 2017 WL 5180304, at *3;

41

see also 20 C.F.R. § 404.1529.[13]  First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."  SSR 16-3p, 2017 WL 5180304, at *3.  A claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms."  Id.  Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques."  Id.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which those symptoms affect his or her ability to work.  See id. at *4.  In making that determination, the ALJ must "examine the

_____

[13] Applicable to ALJ decisions on or after March 28, 2016, the SSA superceded Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 1996 WL 374186 (July 2, 1996) ("SSR 96-7p"), with SSR 16-3p.  The new ruling "eliminat[es] the use of the term 'credibility' from . . . sub-regulatory policy, as [the] regulations do not use this term."  SSR 16-3p, 2017 WL 5180304, at *1.  The ruling "clarif[ies] that subjective symptom evaluation is not an examination of the individual's character," id., and "offer[s] additional guidance to [ALJs] on regulatory implementation problems that have been identified since [the publishing of] SSR 96-7p," id. at *1 n.1.  The ALJ's decision in this case postdates the effective date of SSR 16-3p (see Tr. 51) and, thus, this Recommendation will apply SSR 16-3p to Plaintiff's argument regarding the ALJ's subjective symptom evaluation.

entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

    1. Daily activities;

    2. The location, duration, frequency, and intensity of pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

    4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

    5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

    6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *7-8. The ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Id. at *5 (emphasis added).

43

When evaluating a claimant's subjective complaints about symptoms, however, the ALJ need not take those complaints "'at face value.'" Squires v. Colvin, No. 1:16CV190, 2017 WL 354271, at *5 (M.D.N.C. Jan. 24, 2017) (unpublished) (quoting Ramos-Rodriguez v. Commissioner of Soc. Sec., Civ. No. 11-1323 (SEC), 2012 WL 2120027, at *3 (D.P.R. June 11, 2012) (unpublished)), recommendation adopted, slip op. (M.D.N.C. Mar. 6, 2017) (Schroeder, J.).

Here, the ALJ expressly discussed Plaintiff's testimony that "she experiences back pain all day every day" (Tr. 45; see also Tr. 68), "that she has back spasms and that her back pain radiates into her legs" (Tr. 45; see also Tr. 68-69), "that she has to lie down to relieve pain" (Tr. 45; see also Tr. 374), "that she has arthritis in both of her knees[,] and that she is in constant pain, with the left worse than the right" (Tr. 45; see also Tr. 69), as well as that she can sit, stand, and walk for less than five minutes and lift no more than a magazine (Tr. 45: see also Tr. 71-73). However, as discussed above, the ALJ found Plaintiff's statements not fully consistent with the record evidence. (See Tr. 44.)

Plaintiff submitted a written warning she received on May 27, 2014, from her last employer for violations of the employer's attendance policies (see Tr. 428-29), which she contends contradicts the ALJ's finding that the record did not support the opinions of Dr. Veeragandham and Counselor Russian that Plaintiff's

44

mental impairments would cause her to miss multiple days of work per month (see Docket Entry 13 at 11-12 (referencing Tr. 47, 823, 828); see also Tr. 64-65 (reflecting Plaintiff's testimony that her most recent employer terminated Plaintiff's employment because she attended one to two doctor's appointments per week)).  However, the warning actually reflects that the employer reprimanded Plaintiff for calling out ten minutes before her shift start time and for failing to use the employer's 24-hour call-in line, as well as that Plaintiff missed work on two occasions for unidentified reasons and, on three other occasions, missed work for reasons other than medical appointments or illness, i.e., oversleeping and attending court.  (See Tr. 428.)  In total, the warning reflects that Plaintiff attended five appointments over an approximately six-week period from April 14, 2014, to May 27, 2014 (and missed only partial days on each occasion), a rate of less than one appointment per week.  Moreover, Plaintiff conflates missing time from work for medical appointments and missing entire days of work because her mental symptoms render her unable to perform her job duties.  Dr. Veeragandham and Counselor Russian did not opine that Plaintiff would miss work because of medical appointments but rather because her mental symptoms would cause her to miss work.  The ALJ found that the record lacked support for those opinions in light of the Plaintiff's re-enrollment in classes in February 2016, recent move

45

into a new apartment, and continuing ability to care for her minor child.  (See Tr. 47.)

Finally, contrary to Plaintiff's contentions, the ALJ did not "overlook[]" Plaintiff's "hearing testimony that knee injections did not completely relieve her pain[, ] that pain medications were only somewhat effective on her pain level[, and] that she was in need of knee replacements" (Docket Entry 13 at 12).  The ALJ noted that Plaintiff's knee "injections [we]re helpful in relieving the pain" (Tr. 45 (emphasis added)) and that "the treatment for [Plaintiff's] knees provided relief" (Tr. 46 (emphasis added)), but did not find that those treatments totally or completely alleviated Plaintiff's pain.  Indeed, the ALJ acknowledged that, despite Plaintiff's "treatment for chronic pain, including opioids and injections, . . . she experienced pain such that she was neither able to lift more than 10 pounds occasionally, nor walk and stand without limitation."  (Id. (emphasis added).)  Furthermore, the record contains only Plaintiff's statements that she needs knee replacements (see Tr. 71; see also Tr. 744, 776, 778 (reflecting Plaintiff's reports that orthopedist advised that obesity precluded knee replacements)), and lacks any recommendations or opinions from medical providers that Plaintiff's knee impairment warranted replacements.

Accordingly, Plaintiff's final assignment of error entitles her to no relief.

46

## III. CONCLUSION

Plaintiff has not established errors warranting reversal or remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's motion entitled "Plaintiff Reply Brief in Support of Motion for Summary Judgment" (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 27, 2020

47